CENTRAL MAINE POWER CO.
*vs.*
PUBLIC UTILITIES COMMISSION

Kennebec.  Opinion, October 20, 1954.

258

*Hutchinson, Pierce, Atwood & Scribner,*
*Everett H. Maxcy,* for Central Maine Power Co.

*Richard Sanborn,* for Public Utilities Commission.

SITTING: FELLOWS, C. J., WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, TAPLEY, JJ.

WEBBER, J. On December 29, 1952 the Central Maine Power Company filed with the Public Utilities Commission a revision of its rates. Suspension orders issued pending hearing. Public hearings were duly held during which voluminous testimony and exhibits were received in evidence. By its decree on November 6, 1953, the Commission disallowed the proposed rates but authorized an increase of rates designed to produce approximately $750,000 total additional gross revenues. The authorized rates were predicated upon the assumption that the corporate income tax rate would be reduced on April 1, 1954 from 52% to 47%. Upon reconsideration, the Commission on November 18, 1953, anticipating correctly that Congress might, as it now has, maintain the 52% rate, issued a supplemental decree authorizing a surcharge of 2.7% to be added to all bills, designed to cover the interim situation until the new corporate income tax rate should be established. The surcharge was expected to produce additional annual revenues of $670,000. These total revenues, however, are substantially less than those proposed by the Company, and its exceptions properly raise here legal issues testing the decrees.

The 19 exceptions overlap as to issues raised and we will therefore deal with issues rather than with the exceptions seriatim. In general, the basic question before us is whether or not the Commission has fixed reasonable and just rates, supported by substantial evidence, which will produce a fair return upon the reasonable value of the property of the Company used or required to be used in its service to the public within the state.

The Legislature has established the formula for making rates and has entrusted to the Commission the difficult task of balancing between the interests of the producer of elec-

tric power and the consumer. The Commission deals exclusively with problems of this type and is expected to have and acquire special knowledge and skill which come to the specialist through experience. In a review of Commission action in a rate case, therefore, the court must not err on the side of substituting its discretion and judgment for that of the Commission. It is unlikely that in any given case the rates established by the Commission would be exactly the same as those which a court might determine upon the same evidence—but that fact in and of itself does not render the rates erroneous. Rate making is by no means an exact science and in the last analysis fair rate making depends on the application of a sound judgment. Our review is confined to matters of law only. As we so recently stated in *New England Tel. & Tel. Co.* v. *Public Utilities Commission,* 148 Me. 374 at 377, "The Commission is the judge of the facts in rate cases such as this. This court under the statute which created it is only a court to decide questions of law. It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets the evidence before it, then the question becomes one of law."

The first task of the Commission in any rate case is to determine a rate base, that is to say, the *fair value for rate making purposes* upon which the Company is entitled to earn a fair rate of return. This fair value is quite distinguishable from a fair value as a basis of purchase. It is in

effect a composite ascertained and fixed by giving "due consideration to evidence" of certain factors. The Legislature during the pendency of these proceedings by enactment in P. L. 1953, Chap. 377, Sec. 17 enumerated these factors as "the cost of the property when first devoted to public use, prudent acquisition cost to the utility, current value thereof, less depreciation on each, and any other factors or evidence material and relevant thereto." We agree with the Commission and both parties to the controversy that here was no change in the substantive law, but only an attempted clarification and amplification of procedural requirements to effectuate what has long been the accepted law of this state. As evidence of reproduction cost less depreciation would be material in any determination of "current value," it would be improper for the Commission to exclude such evidence or fail to give it "due consideration." We so recently defined fair value for rate making purposes in the *Telephone* case *(supra)* that no further elaboration seems helpful or necessary.

The requirement that the Commission give "due consideration" to evidence tending to establish any factor of fair value does not mean that the Commission is not the judge of the weight to be given to the proffered evidence. Nor does it mean that equal weight must be given to each factor proven. The Commission may not proceed with a closed mind and no disposition to be convinced by unimpeachable evidence. "Due consideration" requires at least reasonable and fair consideration, and once a factor is well proven, "not only must the Commission give consideration to it, but such factor must find reflection in the finding of value." *Ashland Water Co. v. R. R. Com.,* 7 Fed. (2nd) 924 at 927. As was emphasized in the *Telephone* case *(supra),* arbitrary and capricious disregard by the Commission of a factor established by legislative mandate, or of evidence tending to prove such a factor, is reversible error.

In this case the Company offered evidence in support of the various factors, none of which was excluded. Admittedly the Company had the burden of proof throughout. R. S., 1944, Chap. 40, Sec. 69.

*Average book value depreciated.* As a preliminary to a determination as to what property of the company remains unretired and devoted to public service and what the depreciated original cost factor may be, substantial evidence was received as to the net average property account as shown on the books of the company. As the property is always in a state of flux resulting from increases by way of new construction and other acquisitions and from decreases by way of destruction, obsolescence, retirement and the like, it is recognized that some average period must be used. The Company relied on estimates to forecast the future for the year 1953. The weight to be attached to such estimates is to be determined by the Commission, and the Company does not show prejudicial error where the Commission found an average figure substantially higher than the average for the most recent full year of actual figures, especially where figures for the last four months of that period indicate that the then current trend was for retirements to exceed acquisitions. It is not in dispute that on a long range basis the Company is expanding very substantially, but in its determination of a fair average of book properties, the Commission could not be expected to project its forecast beyond the period it chose, which reflected six months of actual figures and six months estimated. We therefore find no error as a matter of law in the finding of the Commission "that $135,-000,000 represents a fair estimate of what the net operating properties will average on the books of the Company for the year 1953, under the Company's present method of allocation and distribution of accounts." It should be noted that this finding was not of such a nature as to preclude the Commission from a further determination as to whether all

of this book property was of a type properly includable in a rate base or whether there should be further reductions for retirement and the like.

*Original cost less depreciation.* There is no dispute that this factor is intended to be the depreciated original cost of property now existing and devoted to the public use. This cost is taken as of the time when the property was first devoted to the public use, whether that event occurred when it was in the hands of this Company or a former owner. There is apparent agreement also that if accounts are properly distributed and kept in accordance with the Uniform System of Accounts promulgated by the Commission, the original cost is readily ascertainable by subtracting so-called Account E-371 from the amount of net operating property or "book cost." Any and all excess over original cost paid by any subsequent owner or owners is properly accumulated and carried in E-371. The problem here, however, is complicated by conflicts arising out of the evidence as to whether or not Account E-371 is accurate or complete and as to whether or not further deductions should not be made for non-operating property, non-existent property or property which has been or should have been retired. The Company has acquired many plants from other concerns as it has expanded. The original cost of the operating property of some of these plants was incurred thirty or forty years ago. Such matters are properly to be weighed by the Commission both in determining what was depreciated original cost and in giving due consideration to original cost as a factor.

When, however, the Commission makes a determination of depreciated original cost, as it did in this decree, and discloses manifest, substantial and prejudicial error in the method it employed in arriving at that determination, the result is legal error. We need not look beyond the decree

itself to see where obvious though entirely unintentional error occurred. The decree states,

> "There was presented by the state, substantial evidence that there is about $8,200,000 of property presently listed on the Company's books which is open to considerable doubt as to the propriety of its inclusion in original cost of operating property in service. We do not feel sufficient information is presently at hand to adopt the state's evidence in toto. But considering all the above factors and the evidence of both sides as to the original cost of the present properties when first devoted to public use, we find that a total of about $4,500,000 in addition to the present E-371 account, should be deducted from the Company's book figures to arrive at original cost. In short, the original cost of the properties, in our best estimate, is about $128,000,-000."

The E-371 account was approximately $2,500,000. It represented a difference between two gross figures and was itself a gross figure. The other disputed items comprising the $4,500,000 seem also to have been gross items. Yet the sum of these *gross* items amounting to $7,000,000 was subtracted from $135,000,000, admittedly a *net depreciated* figure, in order to produce original cost *depreciated,* itself a *net* figure. In an effort to minimize this error, the able counsel for the State argues that some of the items are nondepreciable and it cannot be ascertained which among items totaling $8,200,000 the Commission selected for deduction. He argues further that the difference between $7,000,000 and $8,200,000 or $1,200,000 is ample provision for accrued depreciation on depreciable items and therefore the $7,000,-000 is in fact a *net* figure. This latter argument presupposes however that the Commission found $8,200,000 to be deductible and then deducted only $7,000,000. This the Commission tells us it did *not* do. It mentioned $8,200,000 as doubtful but said the *evidence* only supported a deduction of $7,000,000. Thus the express finding left no $1,200,000

as a margin to cover depreciation. As to the ascertainment of items selected, there is at least no doubt that the E-371 account was selected, for the Commission says so. That being a gross item, it makes little difference whether the items comprising the $4,500,000 are depreciable or nondepreciable, gross or net. The simile employed by the counsel for the Company is apt. "One cannot add pears to potatoes and get potatoes." Is the error important? Is it prejudicial? We think so. Without suggesting that any rate or method of depreciation is the proper one, but for illustration only, let us assume the composite depreciation rate of 2.193% used by the Company on excess acquisition cost. Applied to approximately $2,500,000 in Account E-371 for a period covering some forty years, the depreciation would be approximately $2,193,000. This amount would represent excess erroneously deducted by the Commission in determining depreciated original cost, and would have to be added to the $128,000,000 which was found. The impact of the error could easily be greater depending on the number of depreciable items in the $4,500,000. This analysis, however, suffices to demonstrate that the result of the error was very substantial and that the Commission in giving the required "due consideration" to depreciated original cost was considering an amount which, *by its own method of computation,* was far lower than was proper. The basic issue is raised specifically by the eighth and ninth exceptions taken by the Company. These exceptions must be sustained.

*Prudent acquisition cost less depreciation.* As has been stated, this factor is intended to reflect the difference, most often an excess, between the original cost when first devoted to public service and the amount invested upon acquisition. This factor brings into focus what the Company *prudently* invested in the property and takes into account that property which is part of an established business often demands a higher price than its original cost. The Company has the

burden of proving its prudence in acquiring property, for the consumer cannot be compelled to provide the utility with an income on its unjustifiable and imprudent acquisitions. The Commission did not determine any amount directly for this factor. It said, "In this instance where the property connected with this acquisition amount has been substantially retired, we can give very little consideration to such amount in the rate base." We do not construe this statement as meaning that the Commission failed to give "due consideration" to the factor. Rather does it appear that upon due consideration, having in mind that the acquisition excess over original cost first made its appearance many years ago, and the item being depreciable, the net result does not weigh heavily in the scales in assessing fair value for rate making purposes. We cannot say that the Commission was in error in this determination. However, we cannot lose sight of the fact that this method of disposing of the factor of prudent acquisition cost less depreciation does nothing to diminish the impact of the error above noted in determining original cost less depreciation.

*Current value.* The Commission properly recognized that no effort to appraise "current value" as a factor would be complete without proper consideration of reproduction cost less depreciation. Reproduction cost as a factor in rate making cases has sailed over stormy and tumultuous judicial seas. Acclaimed as necessary to any determination of fair value in *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418; vigorously attacked by Mr. Justice Brandeis, the "pioneer juristic advocate of the prudent investment theory for man-made utilities," * dissenting in Missouri ex rel *South Western Bell Telephone Co.* v. *Public Service Com.,* 262 U. S. 276, 43 S. Ct. 544; it was finally eliminated in any test of rates promulgated pursuant to Congressional legislation in *Federal Power Com.* v. *Hope Natural Gas Co.,* 320 U. S. 591, 64 S. Ct. 281.

(*Mr. Justice Jackson dissenting in the *Hope Case* cited *infra*.)

Many commissions have repudiated it as a factor as they have repudiated the relation of rates to "fair value." But our legislative mandate, consistently interpreted by this court, has dictated consideration of this factor as we so strongly emphasized in the *Telephone* case *(supra)*. The language of Congress and the language used by our Legislature are not the same. The statute in force at the inception of these proceedings was R. S., 1944, Chap. 40, Secs. 16 and 17, which read as follows:

**"Sec. 16. Public utility to furnish safe and reasonable facilities; charges to be reasonable and just. R. S. c. 62, sec. 16.** Every public utility is required to furnish safe, reasonable, and adequate facilities. The rate, toll, or charge, or any joint rate made, exacted, demanded, or collected by any public utility for the conveyance or transportation of persons or property between points within this state, or for any heat, light, water, or power produced, transmitted, delivered, or furnished, or for any telephone or telegraph message conveyed, or for any service rendered or to be rendered in connection with any public utility, shall be reasonable and just, taking into due consideration the fair value of all its property with a fair return thereon, its rights and plant as a going concern, business risk, and depreciation. Every unjust or unreasonable charge for such service is prohibited and declared unlawful.

**"Sec. 17. Valuation of property to be made if necessary for fixing rates. R. S. c. 62, sec. 40.** The commission shall fix a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the state whenever it deems a valuation thereof to be necessary for the fixing of fair and reasonable rates, tolls, and charges; and in making such valuation it may avail itself of any reports, records, or other information available to it in the office of any state officer or board."

This statute, judicially interpreted, furnished the substantive law applicable here. In Chap. 377 of P. L., 1953, enacted during the pendency of these proceedings, the Legislature reversed the order of the words "just" and "reasonable" in Section 16 and removed from that section the words "taking into due consideration the fair value of all its property with a fair return thereon, its rights and plant as a going concern, business risk, and depreciation." It further substituted a new Sec. 17 to read as follows:

> "Valuation of property made for fixing rates. In determining reasonable and just rates, tolls and charges, the commission shall fix a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the state and a fair return thereon. In fixing such reasonable value, the commission shall give due consideration to evidence of the cost of the property when first devoted to public use, prudent acquisition cost to the utility, *current value thereof, less depreciation* on each, and any other factors or evidence material and relevant thereto. In making such valuation the commission may avail itself of any reports, records or other information available to it in the office of any state officer or board." (Emphasis supplied)

These amendments elaborated as to procedural matters, but did not change the basic substantive law which was in effect at the inception of this rate case and which of course controlled the disposition of this case as all concerned recognize. "Commonly statutes relating merely to the remedy or procedure and not affecting substantive rights have been said to operate retroactively. * * * It is usual for such statute to be applied to existing causes of action and even to pending cases." *E. B. Horn Co.* v. *Assessors of Boston*, 321 Mass. 579, 74 N. E. (2nd) 421 at 423; see also 82 C. J. S. 999 (Note 37 and cases cited) ; *Oriental Bank* v. *Freeze*, 18 Me. 109.

The conjunction in the amendment of the words "current value, less depreciation on each" creates some confusion as to legislative intent. Obviously the Legislature could not have intended that the words should mean "current value less depreciation." This would create a paradox as "current value" in and of itself reflects depreciation, and depreciation is not applied twice. It is apparent that the words "less depreciation on each" were intended to apply to the original cost and prudent acquisition cost factors only, leaving "current value" to reflect those factors which are ordinarily determinative of the current value of anything. Not the least of these factors, as we have said, is reproduction cost less depreciation. With this concept of legislative requirement apparently in mind, the Company presented the testimony of an independent engineer together with a voluminous exhibit prepared by him. Presumably the Company sought to escape the charge of bias and prejudice which would naturally attend any effort to rely on the evidence of its own engineers and officers. The witness does not appear to lack either training or experience. His approach was to use reproduction cost less depreciation, controlled downward by other operative factors, in an effort to estimate current value. In dealing with this factor, we are necessarily dealing with estimates and matters of judgment. Where judgment is involved, the Commission is justified in subjecting the proffered evidence to very close scrutiny and critical analysis. The weight to be given to it is for the Commission, but the assessing of weight can only be done properly in a spirit which is not arbitrary or capricious or founded on immovable preconceptions. The Commission severely criticised the witness for a bias which on perusal of his testimony and exhibit tends to escape us, and for errors which seem to us hardly prejudicial enough to defeat the entire purpose of the evidence. The Commission is highly critical of his comparisons of hydro-electric property and steam operated property, and say in the decree, "His meth-

od of evaluating the hydro facilities of the Company on what costs would be for equivalent steam plants, discounts sharply this State's acknowledged natural water resources and leaves the public to absorb the extra costs entailed by expensive transportation of oil and total use of steam." The Commission would indeed be derelict in duty if it did not preserve for the public every benefit to be derived from the presence of natural water power in this state. But as we read the record, we are at a loss to find any evidence whatever to support the statement quoted. What the witness did seems quite obvious. He took into account the very high corporate income tax rate of 52% of net earnings, which in the last analysis must be paid by the rate-paying consumer of power. He recognized the fact that hydro property with its large investment and low operating cost is more vulnerable to the income tax than steam property with its relatively low investment and relatively high operating expense. Wherever he found hydro property which under these conditions was not as advantageous a producer as comparative steam property, he *reduced* the value of the hydro proportionately. In not one instance did he use steam comparison to *increase* the current value which he placed on hydro property. The cases cited by the State repudiate the assignment of an *increased* value of water rights by capitalizing the savings of hydro production over equivalent steam operation as tending to deprive the public of the benefit of its natural resources. We do not see that they apply where the value of the natural resources tend under certain conditions to be *diminished* by steam competition. Actually, the impact of steam comparison as applied by the witness resulted in a reduction in current value of approximately four million dollars, all to the advantage of the public and the detriment of the Company. This does not impress us as the attitude of a person heavily biased in favor of the Company. The witness produced as a final estimate of current value (a depreciated figure) the amount of $163,986,139. In estimat-

ing a property of such size, perfect exactitude could neither be expected nor required. Certain errors were inevitable and the Commission was duty bound to weigh the evidence fairly and, if necessary, reduce the estimate as the evidence and sound judgment might suggest. What the Commission did was summarily to dismiss any evidence of current value in these words, "Altogether, we feel that the witness, with his exhibit, has not produced a total figure which is satisfactory evidence of the current value required by the statute." Starting with a depreciated original cost erroneously computed as $128,000,000, and disregarding prudent acquisition cost depreciated for reasons we have discussed, the Commission determined fair value for rate purposes as $132,000,000 which is only $4,000,000 more than its own concept of original cost depreciated. Yet it cannot be disputed that the factor of current value is *the only one* which in any way reflects the greatly increased costs which seem to have become implemented into our economy. We cannot escape the conclusion that the Commission based its findings on a preconception that the Legislature is in error in using current value as a factor. It is not enough to give mere token recognition of a factor imposed by legislative mandate. The factor, properly determined, must find appreciable reflection in the end result. In the light of what everyone knows about increased costs generally, we do not believe that an increase over original cost depreciated of barely over 3% is an appreciable reflection of the impact of inflation upon values. Obviously if the original cost factor had been correctly determined, the percentage of increase reflected in an end result of $132,000,000 *would be substantially less than 3%*. The fact that there has been a substantial inflation has not escaped our attention. "Judges are not necessarily ignorant in court of what everybody else, and they themselves out of court, are familiar with; and there is no reason why they should pretend to be more ignorant or unobserving than the rest of mankind." *Affili-*

*ated Enterprises* v. *Waller*, 5 A. (2nd) (Del.) 257, 261. We quoted this statement in *Melanson* v. *Reed Bros.*, 146 Me. 16 at 22, and added this comment, "This principle is as applicable to justices of the Law Court as it is to justices at *nisi prius.* * * * It not only may, but should be applied in determining what conclusions should be drawn from existing facts." We conclude that the Commission misinterpreted and closed its mind to the evidence relating to current value and failed to give any proper weight to the factor in determining the rate base. As these issues are specifically raised by the Company's 11th, 12th and 13th exceptions, those exceptions must be sustained.

*Amortization of pension premiums.* In 1946 the Company set up an insured pension plan for its officers and employees as part of its wage structure. Substantial premiums were paid on account of the past services of its then employees. The Internal Revenue Code, Title 26, Sec. 23, subsec. P (1) (A) (iii) provided that for tax purposes there was deductible "an amount not in excess of ten per centum of the cost which would be required to completely fund or purchase such pension," etc. Accordingly, the Company set this up to be amortized over a ten year period. In determining how the impact of this cost should be reflected in rates, the Commission decreed that amortization should be spread over what remains of a thirty year period. There appears to be a well defined trend of authority which supports the treating of such payments as operating expense. In *PUC* v. *N. E. Tel. & Tel. Co.*, 80 PUR (N.S.) 397, 417 et seq., the Maine Commission allowed interest on the unfunded actuarial reserve requirement for pensions to be included as an operating expense in computing rates. See also re *Michigan Tel. Co.*, 91 PUR (N.S.) 129; re *Cinn. & Sub. Bell Tel. Co.*, 100 PUR (N.S.) 179; re *Uniform System of Accounts* (N.Y.), 82 PUR (N.S.) 161; *Pittsburgh* v. *Penn. PUC*, 370 Pa. 305; 88 A. (2nd) 59; and Note on Unfunded Actuarial Liability in 64 Harvard Law Review 633. The

reason usually advanced is that present and future consumers are deemed to benefit from the increasingly contented work force which results from an equitable wage structure including the granting of past service pensions. It seems clear that the longer the past employment of an employee continued, the shorter will be the time during which he will serve before retirement and benefit the Company and its customers as a satisfied employee, *but* the greater will be his impact on the premium for past services. This suggests the fairness to future consumers in not extending the amortization period too far into the future. It is the consumer of the relatively near future who will benefit most from the expenditure of the past service premium. The Company, in setting up the amortization program, had very properly to consider the impact of the income tax and the tax limitations upon its right to amortize, and also the impact of the proposed program upon rate paying consumers present and future. In adopting the ten year period, the Company chose the shortest time permitted by the Internal Revenue Code, *supra*, but it also chose the period during which pension rights, which accounted for over 87% of the past service premium, will have vested. Those employees whose pension rights have vested can leave their employment even before they are eligible for retirement and take their pension rights with them. We think that under all the circumstances this was as fair a method of spreading the past service cost as could be readily devised. The determination was primarily a matter of managerial discretion and certainly no abuse of such discretion was involved, nor was there any capricious or arbitrary action which would place an unfair burden upon any group of consumers. On the other hand, we are unable to follow the reasoning of the Commission in arbitrarily selecting a period of thirty years for amortization. Some employees may have been employed for a period of as much as thirty years in the past, but that fact does not seem to us to compel the conclusion that there-

fore rate paying consumers should bear expense extending thirty years into the future. As we have said, the consideration should rather be as to what present and future consumers are benefited, and to what extent, by the particular pension expense. It was error for the Commission to disregard the annual charge for pension payments which was included in Amortization and General Expense. The allegation of error in this respect was made by the Company in its 16th Exception, and this exception must therefore be sustained.

*Other issues.* In view of the necessary disposition of this case which results from our determination of the basic issues above discussed, it seems unnecessary to consider in detail what may perhaps be considered secondary issues. However, some brief comment may be helpful in such further proceedings as may be required.

(a) *Wholly owned subsidiary.* The Company owns all the stock of Union Water Power Company which controls reservoirs, dams and water rights useful to the Company in its operations. The Commission does not make it apparent whether it included or excluded this property from the rate base, although the inference appears to be that it was excluded.

Where the subsidiary property is entirely devoted to the operation of the parent company and would clearly be included in the rate base if legal title stood in the name of the parent company, some authorities have held that there is no sound or practical reason for excluding it only because complete control is by stock ownership rather than deed. *City of Detroit* v. *Detroit Edison Company*, PUR 1933 E 193; *Public Service Commission of Washington* v. *Grays Harbor Rwy. Light Co.*, PUR 1915 C 518. Some Commissions refuse to include the property in the rate base but make allowance for required earnings to compensate for the elimination. Re *Public Serv. Co. of N. H.*, 92 PUR (N.S.) 443;

Re *Public Serv. Co. of N. H.*, 93 PUR (N.S.) 129. But where, as here, it appears that part of the subsidiary property is not devoted to operations of the Company, and in addition is subject to rights of long term lessees who are third parties, prejudicial error cannot properly be predicated on the failure of the Commission to include the subsidiary property in the rate base. We assume that if income by way of dividends from the subsidiary corporation was included by the Commission in estimating operating revenues of the Company, and at the same time the subsidiary property was excluded from rate base, the error was inadvertent and will be corrected. We cannot determine with certainty from the decree whether such was the case.

(b) *Undistributed property account.* There existed three such accounts totaling $19,396,065. It is not disputed that the required distribution of these accounts to appropriate primary accounts was delayed by the Company for many years, presumably because substantial manpower and expense would be involved. The Company admits that it has been repeatedly urged by the Commission in the past to make the distribution. The very considerable task involving the work of many months was finally undertaken and was virtually completed in March while this rate case was pending. We do not feel that the Company can now be heard to complain if the Commission, having been afforded no reasonable time or opportunity to verify and approve the distributions, has refused to give present blanket approval to Company action. The task of the Commission in scrutinizing the distributions is itself a considerable one and the Company in selecting a time to propose new rates must have known that an intelligent appraisal of a distribution action so long delayed would be a virtual impossibility in the midst of a pending case.

(c) *Working capital.* We find no error in the determination of the Commission that income tax accruals should

provide for working capital needs after proper deduction for materials and supplies used for new construction. We do not understand that the Company contends that income tax accruals may not be so employed as a matter of law. Moreover, taxes will continue to be accrued on the basis of the current 52% rate.

(d) Other issues seem to us of relatively minor importance and we note no prejudicial error in the Commission's action with respect to them.

*Conclusion.*

The Commission determined that,

> "Considering all the evidence before us, including various bases of property value, we find that under these present circumstances a rate of return of 5.9% is just and reasonable on a rate base of $132,000,000. This will result in a fair return to the Company of $7,800,000."

We do not understand that the Company questions the fair rate of return fixed at 5.9% and in any event there was substantial evidence to support the finding. This fair rate of return as has been pointed out must be applied to a fair rate base and one which is determined pursuant to legislative mandate. The rate base here selected not only is artificially reduced by error in the original cost factor patent on the face of the decree, but gives insufficient consideration rather than appreciable reflection to the factor of current value or what might be termed the present well known economic facts of life. Rates predicated on such error must be reconsidered. The public properly demands service and to fulfill these demands the Company must expand. It cannot serve or expand if its financial structure does not attract confidence. The uncertainties of the weather and its water resources compel it to have standby steam capacity to guarantee service under all conditions, with resulting unavoid-

able expense. It must contend with greatly increased costs of materials and labor and an income tax which deprives it of over a half of every net dollar. On the other hand, the Commission must strike a nice balance between the essential revenue needs of the Company and the value of the service to the rate payer and his ability to pay. *Kennebec Water Dist.* v. *Waterville,* 97 Me. 185. We cannot and do not say what is the fair value for rate making purposes or what the rates should be. That determination must reflect the judgment of the Commission within the scope permitted by the evidence. We say only that when error is manifest, there must be reconsideration, where the result of that error appears to be substantial prejudice.

*Exceptions sustained.*

*Case remanded to Maine Public Utilities Commission for a decree upon the existing record in accordance with this opinion.*