1997 ME 32

**RANGELEY WATER COMPANY**

v.

**RANGELEY WATER DISTRICT.**

Supreme Judicial Court of Maine.

Argued Oct. 10, 1996.

Decided Feb. 28, 1997.

William S. Harwood (orally), William C. Knowles, and James I. Cohen, Verrill & Dana, Portland, for plaintiff.

Alan G. Stone (orally), Clifford, Stone & Herman, Lewiston, for defendant.

Before WATHEN, C.J., and GLASSMAN, RUDMAN and LIPEZ, JJ.

LIPEZ, Justice.

[¶ 1] The Rangeley Water District appeals from the entry of a judgment in the Superior Court (Franklin County, *Mills, J.*) adopting the report of the referee appointed by agreement of the parties to value the assets of the Rangeley Water Company (Water Company) after such assets were condemned by the Rangeley Water District (Water District). On appeal, the Water District challenges the referee's valuation of the assets of the Water Company and his inclusion of the Lakehause water line as a Water Company asset. The Water Company cross appeals, challenging the referee's valuation of its assets. Finding no error in the judgment of the Superior Court, we affirm.

## Background

[¶ 2] The Rangeley Water Company was created in February of 1905 by an Act of the Legislature to serve water customers in the Rangeley Lake area. P. & S.L.1905, c. 44. Immediately before the assets of the Water Company were condemned in 1993, the utility served about 385 customers. The Rangeley Water District is a quasi-municipal corporation formed in 1992 by the Legislature. P. & S.L.1991, Chapter 72, § 1 (effective March 11, 1992). The District is regulated by the State under the provisions of 25–A M.R.S.A. §§ 6301 *et seq.* The Water District exercised its power of eminent domain on January 22, 1993, condemning and subsequently acquiring the assets of the Water Company. P. & S.L. ch. 72, § 13.[1]

[¶ 3] The Water District paid $262,000 to the Water Company for its condemned assets. On March 29, 1993, the Water Company sought review of the condemnation award in the Superior Court. By agreement of the Water Company and the Water District, the matter was referred to a court-appointed referee, who held seven days of evidentiary hearings and issued a report to the Superior Court detailing his findings concerning the value of the condemned properties. The referee's initial report to the Superior Court underwent two subsequent revisions [2], and a final report was issued on March 29, 1995.

[¶ 4] Both the Water Company and the Water District objected to the referee's final report valuing the Water Company's condemned assets at $407,504 and filed their objections to the referee's report with the Superior Court. In an order dated February 24, 1996, the Superior Court adopted the final report of the referee in its entirety. A timely appeal by the Water District and cross appeal by the Water Company followed.

## Discussion

[¶ 5] When the court adopts a referee's report in full, we review the decision of the referee directly. The referee's findings of fact are reviewed for clear error. *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1001 (Me.1989). "On appeal, we will uphold the court's adoption of those factual findings if there is credible, probative evidence supporting them, even though there may be evidence to support contrary findings." *Wellington Associates v. Capital Fire Protection Co.*, 594 A.2d 1089, 1091 (Me.1991). We will not invade the province of the referee and substitute our judg-

---

1. P. & S.L. ch. 72, § 13 reads as follows: "The district may acquire by the exercise of the right of eminent domain, a right expressly delegated to the district for that purpose, the entire plant, properties, franchises, rights and privileges except cash assets and accounts receivable, owned by the Rangeley Water Company ... and if and when so acquired, the district, in addition to the powers conferred by this Act, shall have and enjoy and be entitled to exercise all rights, privileges and franchises of the Rangeley Water Company."

2. The initial report, issued January 2, 1995, valued the Water Company's condemned property at $464,764. The referee's first report was adopted by the Superior Court on January 5, 1995, but the Court vacated its judgment on January 13, 1995, following the parties' joint motion for relief from judgment. The referee's second report, dated February 13, 1995, reduced the valuation to $397,752. The referee's final report, issued on March 29, 1995, increased the valuation to $407,504 and was adopted without modification by the Superior Court.

ment for the factfinder, who was appointed by agreement of the parties to value the utility property. "It is not for us to mandate the use of any single appraisal method in valuing" such property. *Shawmut Inn v. Inhabitants of the Town of Kennebunkport,* 428 A.2d 384, 392 (Me.1981).

## Valuation Methods

### *Water District's Contentions*

[¶ 6] The Water District argues that the referee erred in choosing among valuation models and in applying a final valuation figure to the Water Company's property. The District contends that the referee erred in two ways: first, by failing to consider the sales of three water utilities proximate in time to that of the Rangeley Water Company, and second, by failing to use the "capitalization of income" method of valuation.

### *The Three Water Companies*

■ [¶ 7] The referee excluded the sales of the Millinocket, Skowhegan and Greenville water companies in arriving at his "multiplier" figure for valuing the Rangeley Water Company because he determined that there was a distinction between the purchase price paid for a water utility by private purchasers of water utilities and the price paid by water district or water utility purchasers. In reaching his conclusion, the referee compiled a list of water utility sales that he considered relevant to his analysis. He averaged the price to net utility plant ratio of the sales of seven water utilities in Maine since 1980, all of which were sold to water districts. The referee excluded those water utilities that were sold to private parties, finding that as a group sales to private companies were at significantly lower prices than sales to water districts. The record indicates that the water utility sales used by the referee sold at prices ranging from 1.60 to 1.88 times net utility plant, while the three properties ex-

cluded by the referee sold at an average price of only .76 times net utility plant.

[¶ 8] There is substantial evidence in the record to support the referee's finding of a distinction between private and water district purchasers of water utilities. For example, the Water Company's accountant, John White, testified that certain water utility sales more closely matched the characteristics of the buyer and seller in the case of the Rangeley Water Company. The distinction drawn by the referee was an appropriate means of balancing competing evidentiary offerings from the Water District and the Water Company.

### *Methods of Valuation*

[¶ 9] We have previously approved the use of three standard methods of valuation: the "comparative" method, the "income or capitalization method," and the "reproduction cost new less depreciation" or "cost" method. *Shawmut Inn v. Inhabitants of the Town of Kennebunkport,* 428 A.2d 384, 390 (1981). We further recognized that "theoretically, all three methods are employed in any appraisal, but often only one or two are useful or even useable in a given appraisal, depending upon its nature and purpose." *Id.* Notably, we held in *Shawmut Inn* that it "is not for us to mandate the use of any single appraisal method in valuing commercial or any other taxable property." *Id.* at 392.

■ [¶ 10] In his report, the referee conducted an extensive analysis of each of the methods of valuation that were presented to him by the opposing parties and discussed his reasoning for rejecting certain methods and adopting the "comparable sales" method. The referee was not compelled by law to adopt any particular method of valuation, and his reasons for rejecting the "capitalization of income" method of valuation [3] find substantial support in the record. Similarly, the record supports the referee's rejection of both the replacement cost new less deprecia-

---

3. The referee rejected the capitalization of income method because "the particular circumstances of the Rangeley Water Company make it difficult, if not impossible, to arrive at a reliable indication of value by this route." The referee rejected both the Water Company's and the Wa-

ter District's suggested capitalization methods. He rejected the Water Company's because it could "in no way be relied on to establish the actual value of the assets being condemned"; the referee found the Water District's method "equally extreme in the opposite direction."

tion (RCNLD)[4] and the ability to finance[5] methods.

### Water Company's Contentions

[¶ 11] In addition to arguing unpersuasively that the referee erred in refusing to apply the replacement cost new less depreciation and the ability to finance methods of valuation, and erred in his reliance on the comparative sales method of valuation, the Water Company contends that the referee erroneously excluded $12,000 in construction work in progress (CWIP) and $9,937 in inventory (material and supplies) from the value of the Water Company. The referee concluded that the evidence provided an "insufficient basis for a finding of additional CWIP that should be included in the net operating plant account." That decision is supported by the record. The referee found that the materials and supplies "were also not included in the net operating plant accounts of the comparable companies used as the basis for determining the appropriate factor for application of the comparable sales method." That conclusion is based on extensive testimony offered by both parties about various methods of valuing water utilities. His decision to exclude the $9,937 in equipment and material from the valuation of the Rangeley Water Company finds support in the record.

[¶ 12] The Water Company also argues that the referee erred in reducing the multiplier derived from the comparative sales analysis from 1.65 to 1.55 to reflect the reduction in the value of the Water Company because of its noncompliance with the Safe Drinking Water Act. There is substantial evidence in the record to support the referee's conclusion that the Water Company was not in compliance with the Act and that its noncompliance lessened the value of the company's assets. Although the referee found "scanty evidence" to suggest how the reduction in value should be reflected in the multiplier applied to the Water Company's assets, the referee's application of a .10 reduction in the multiplier appropriately considered numerous aspects of the Water Company's physical plant.[6]

### Inclusion of the Lakehause Line

[¶ 13] The Lakehause line is an approximately 1200 foot distribution main attached to the Water Company's Route 4 line and extending into the Lakehause development, a three building condominium complex. The Lakehause line provides water service to nine condominiums in the three buildings. The Water District contends that the referee improperly included the Lakehause water line in the valuation of the Water Company. The condemnation order issued by the Rangeley Water District on January 22, 1993, stated that it was taking by eminent domain "the entire plant, properties, franchises, rights and privileges owned by the Rangeley Water Company...." The referee concluded that the Lakehause line was owned by the Water Company.

[¶ 14] Chapter 65 of the Maine Public Utilities Commission (PUC) rules establishes standards and conditions for the extension of water utility lines. Under Chapter 65, § 1(H) (1987), a main or main extension is defined under the PUC rules as:

---

4. The referee found as follows: "Because of the obsolete condition of many of the Rangeley assets and because of the high improbability that anyone would reconstruct the system in its present configuration, the replacement cost new less depreciation method of appraisal cannot be relied on for determination of value.... Neither party was able to provide satisfactory evidence of land value under this method."

5. This method was presented to the referee by the Water Company's expert. The referee found that "Mr. White's 'ability to finance' method may set an upper limit on fair market value, but can in no way be relied on to establish the actual value of the assets being condemned." The referee also concluded that the "various income and capitalization methods are of less applicability because of the low level of past earnings and the difficulty of determining what level of earnings can be anticipated in the future."

6. In his report, the referee cited "the sales ratios of comparable water systems before the Safe Drinking Water Act; the antiquated condition of the Rangeley assets; the small size of the system; the size of the investment required to modernize the system and bring it in compliance with the Safe Drinking Water Act, the owners' ongoing difficulties in obtaining financing and sufficient revenues to support the financing."

a water line in a public way owned by the utility to serve one or more customer, multi-unit dwelling complex, or commercial or industrial development; or a water line owned by the utility on private property to serve more than one customer, multi-unit dwelling complex, or commercial or industrial development or to serve a single customer, multi-unit dwelling complex or commercial or industrial development if another person or entity has an easement or other right of access for water line purposes. A new main shall be a main extension for the 10 years following connection of the first customer. Pursuant to a decision by a utility under section 2(C), a new water line on private property to serve a single customer, multi-unit dwelling complex development shall be a main extension.

Ch. 65, § 1(H) (1987).[7]

Section 2(C) of Chapter 65 provides that

[a]ny private line which will continue to be used as a main shall be conveyed to the utility without charge. All mains shall be owned and maintained and replaced by the utility as provided in section 2(A) and the utility shall be provided all necessary easements. Refusal or failure to comply with the requirements stated herein or failure of the unauthorized connecting person to voluntarily disconnect shall be grounds for disconnection....

Section 2(A) of Chapter 65 provides that all water main extensions "constructed pursuant to this rule shall be owned, maintained and ... replaced by the utility." Ch. 65, § 2(A) (1987).

[¶ 15] Despite these rules, the Water District cites evidence in the record that the Water Company sought to have ownership of the line transferred from "Rangeley Lake Hause, Inc.," the developer of the condominium complex, to the Water Company. In a letter dated September 5, 1989, Water Company President Eldon Morrison wrote to the condominium developer that "ownership of the line needs to be transferred to the Rangeley Water Company via a recordable document...." The Water District argues that no such transfer was ever made, and thus ownership of the Lakehause line rests with the condominium complex.[8] We agree, however, with the Water Company's contention that no formal deed was required because the Water Company, pursuant to the rules of the PUC, owns the Lakehause line by operation of law.

[¶ 16] The activities of the Water Company reflect this ownership. Albert Hodsdon, an engineer, testified before the referee that he was hired by the Water Company to prepare a design for the Lakehause line. He testified that the Water Company decided to design the line "after we realized ... that they didn't have the expertise to do—to prepare a design for it. So we prepared the design of the Lakehause for them."[9] Eldon

---

7. This chapter of the PUC rules prevents the construction of water systems that mix public and private lines because of the difficulty of maintaining consistent and uniform water service through those lines. Towards the goal of uniform service, section 2(C) of the 1987 rules provides that if the owner of a private line requests that a water utility provide water service through that line, the utility may require that the private line become utility property:

Upon application for service through a water line to be constructed after May 7, 1986, which is otherwise defined by section 1(K) as a private line, the utility may require a main extension if it decides that the private line will be detrimental to the proper development of the water system. Ch. 65, § 2(C).

8. In a letter to the Rangeley Lake Hause, Inc., dated January 21, 1993, the Water Company wrote to "confirm the acceptance of the Phase I water main extension ... which the Rangeley

Water Company has been maintaining for the last 7 years."

9. Hodsdon also testified about the extent of his involvement with the Lakehause Line:

Q: Mr. Hodsdon, did you provide any specifications as to the Lakehause extension?
A: Yes, we did.
Q: And can you describe generally what those specifications were?
A: On the materials to be used, the method of metering for the system, and general installation procedures.
Q: And why would you be providing the standards—those specifications and standards to the developer?
A: We were providing it to the water company, and they were providing it to the developer because the developer was going to pay to have it installed.
....

Morrison of the Water Company testified that since the time he acquired a controlling interest in the company in 1988 the residents of the Lakehause condominium units had been billed for service by the Water Company. He also testified that the Water Company conducted annual maintenance activity on the Lakehause line.

[¶ 17] Even if the Water Company owns the Lakehause line as a matter of law, the Water District contends that the referee should not have included the line in his valuation of the Water Company because the Company did not pay for construction of the line and is thus being unfairly compensated for property that the Water Company suffered no expense in acquiring. In a rate proceeding, contributed property is not included in a utility's rate base because it would be unfair to allow the utility's investors to recoup from ratepayers money that the utility did not expend. "Depreciation on contributed property is therefore disallowed not to credit the donees, but to insure that investors who did not supply capital for the contributed property do not recover on an 'investment' they did not make." *Central Maine Power Co. v. P.U.C.*, 405 A.2d 153, 166–7 (Me.1979). The P.U.C. will not permit utilities to recover from ratepayers the depreciation of contributed property because the utility "did not make the original investment in the contributed property, [and] it has nothing to recover through depreciation." *Maine Water Co. v. P.U.C.*, 388 A.2d 493, 495 (Me.1978).

[¶ 18] The condemnation of utility property, however, involves different considerations. Valuation of the utility's condemned property must ensure that "as the end result of the exercise of the power of eminent domain, the owner will be receiving the equivalent monetary worth for the value of the property taken from the time of taking." *Orono–Veazie Water District v. Pe-*

*nobscot County Water Co.*, 348 A.2d 249, 255 (Me.1975). The Rangeley Water Company is entitled to "just compensation for the taking of [its] property by the process of eminent domain." *Curtis v. Maine State Highway Comm'n*, 160 Me. 262, 265, 203 A.2d 451, 453 (1964). "Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service." *Board of Public Utility Commissioners v. New York Tel. Co.*, 271 U.S. 23, 31, 46 S.Ct. 363, 366, 70 L.Ed. 808 (1926). The original source of the funds for construction of the Lakehause line does not prevent the inclusion of the line in the valuation of the Water Company when the line was Water Company property under the law. "The complete dissimilarity between rate-making concepts and the just or full compensation standards which govern eminent domain have resulted in rejection of attempts to equate rate-making with eminent domain as a basis for determining fair market value." *Dade County v. General Waterworks Corp.*, 267 So.2d 633, 640 (Fla.1972) (citation omitted). The Water Company owned the line and used it in the provision of water service, thus entitling the company to compensation for the line when it was condemned.

### *Valuation of the Lakehause Line*

[¶ 19] The Water Company challenges the referee's decision to adjust his valuation of the Lakehause line downward from $69,422 to $55,066. In his final report, the referee made two adjustments to the valuation of the Lakehause line. First, he adjusted for inflation by reducing the 1993 value of the Lakehause line by 3% per year from the 1987 construction date to the 1993 condemnation. Second, he applied a five year depreciation in value based on a 75 year life of the line. The Water Company argues

---

Q: Why did you provide plans—what was your understanding of the reason why you provided plans and specifications for the Lakehause extension?

A: It was my understanding that the pipe was going to be installed by the developer and turned over to the water company when it was completed and accepted by the water compa-

ny. And that was we had to have the written easements, and the pipe had to be installed correctly, et cetera.

Q: Why did you need to provide specifications and standards for the—

A: Because the developer was going to do the installation.

that there is no evidence in the record supporting either reduction.

[¶ 20] We find no error in the referee's inflation calculation. "The fact that there has been a substantial inflation has not escaped our attention. 'Judges are not necessarily ignorant in court of what everybody else, and they themselves out of court, are familiar with; and there is no reason why they should pretend to be more ignorant or unobserving than the rest of mankind'." *Central Maine Power v. P.U.C.*, 150 Me. 257, 272, 109 A.2d 512, 519 (1954) (rejecting PUC valuation for failure to take account of "substantial inflation") (quoting *Affiliated Enterprises v. Waller*, 5 A.2d 257, 261 (Del.1939)). The referee's use of a 3% inflation rate to reduce the value of the Lakehause line is consistent with this rationale.

[¶ 21] The depreciation figure is based on a trial exhibit, the 1992 annual report of the Rangeley Water Company, which contained a schedule of depreciation losses taken by the Water Company. "Depreciation, like the market value of property, could not be proved with mathematical certainty and must ultimately rest in the realm of opinion, estimate and judgment." *Kittery Electric Light Co. v. Assessors of Town of Kittery*, 219 A.2d 728, 738 (Me.1966). The referee was not required to accept the Water Company's estimate of the value of the line, and the referee's reduction in the value of the line based on depreciation is supported by the record.

### Severance Damages

[¶ 22] The Water Company contends that the referee erred in refusing to grant severance damages of $62,720 to the company, reflecting the money the company spent on plans to bring itself into compliance with the Safe Drinking Water Act (SDWA). These plans became useless when the Water District condemned the Water Company.

[¶ 23] The referee found that even though the Water Company's SDWA compliance plans were no longer of use, it was impossible to determine which, if any, of the expenditures for those plans would have been of use to the company had it not been con-demned. The referee further found that the valuation of the Water Company had already taken account of whatever portion of the company's SDWA compliance plan expenditures could be considered Water Company assets, and thus severance damages should not be awarded separately. The referee's decision to deny severance damages is based on competent evidence in the record.

The entry is:

Judgment affirmed.

