### ELKO–LAMOILLE POWER CO. v. PUBLIC SERVICE COMMISSION OF NEVADA et al.

District Court, D. Nevada.
Oct. 20, 1932.

Milton B. Badt and James Dysart, both of Elko, Nev., for plaintiff.

Gray Mashburn, Atty. Gen., and W. T. Mathews, Deputy Atty. Gen., for defendants.

Before WILBUR, Circuit Judge, and LOUDERBACK and NORCROSS, District Judges.

NORCROSS, District Judge.

The Elko-Lamoille Power Company filed its bill in equity to restrain defendants from enforcing rates fixed by order of the Public Service Commission of date February 13, 1931, for services rendered by plaintiff as a public utility. The claim for relief is predicated upon the contention that the rates thus fixed are unjust, unfair, and confiscatory, and would deprive plaintiff of a just, fair, or reasonable return upon the value of its property, thus compelling plaintiff to devote its property to public use without just or adequate compensation, in violation of the Fourteenth Amendment to the Federal Constitution.

The action of the commission complained of was initiated by a complaint filed with the commission by the city of Elko, alleging the assessing of unreasonable rates for power and light service and seeking a reduction.

Plaintiff company's plant comprises three Diesel engines at Elko, severally purchased and installed as units in the years 1922, 1924, and 1927, the kilowatt capacities respectively being 250, 120, and 520, a total of 890 kilowatts. The company also owns a hydroplant situate in Lamoille Canyon, some 23 miles south of Elko, together with a transmission line to Elko and distribution line to a limited number of users at Lamoille village near the hydroplant. Ordinarily the hydroplant delivers 250 kilowatts, less 10 per cent. transmission loss, to Elko. The peak load in 1929 was approximately 540 kilowatts, to which was to be added 60 kilowatts to be used by the Southern Pacific Company at its diversion point at Carlin about 20 miles west of Elko.

An appraisal of the physical properties of the plaintiff company was made by L. F. Leury of San Francisco, as the utility's engineer, of date December 31, 1929. In like manner an appraisal was made by Paul C. Kreuch, acting as engineer for the city of Elko, as of May 1, 1930. To the respective appraisals were added overheads, and the property then depreciated to give its value at the time of hearing before the commission. There were then added certain intangibles, including working capital and going concern value, and, in addition, material and supplies on hand. An analysis of the rate base as found respectively by the two engineers is as follows:

| | Leury | Kreuch |
|---|---|---|
| Reproduction cost.. | $464,811.00 | $456,829.00 |
| Per cent. of overheads .......... | 16.9% | 12.2% |
| Cost plus overheads .......... | 543,225.00 | 512,561.00 |
| Depreciation in dollars ............ | 114,466.00 | 192,652.00 |
| Condition per cent. | 79.% | 62.% |
| Reproduction cost less depreciation | 428,759.00 | 319,909.00 |
| Working capital... | 25,000.00 | 5,500.00 |
| Going concern value | 50,000.00 | 43,400.00 |
| Material and supplies on hand... | 8,202.00 | 4,075.00 |
| Merchandise on hand .......... | 6,177.00 | 0.00 |
| Total value—Total Capital or Fair Value ........ | $518,138.00 | $372,884.00 |

The commission made the following finding: "After a consideration of all elements of value including reproduction cost, put in evidence before us, we are of the opinion and find that the fair value of the Elko Lamoille Power Company does not exceed $400,000.00."

Concerning the question of "Fair Value" the opinion of the commission contains, among other expressions, the following: "The fair value of the property * * * will not be found and justice done to both the utility and the public by the adoption of reproduction cost less depreciation as the sole measure of fair value. * * * Reproduction cost is an engineering estimate and varies with the individual making the estimate

* * * There is room for a wide variation in the opinions of engineers. Most engineers are governed to a considerable extent by the use of percentages for overhead costs and average unit costs derived from outside sources. A strange mixture of fact and fiction results which is termed reproduction cost. We have the opinion of two engineers as to the cost to reproduce this property. The engineers estimate the cost to reproduce new as approximately the same amount, at least close enough to indicate that their figures for reproduction new are reasonably accurate, although unit costs in the Company's appraisal, taken as of December 31, 1929, are higher than present day prices."

Upon the question of "Depreciation" the commission found:

"There is no evidence of any substantial depreciation in this property from a service standpoint. It appears to have been maintained in good operating condition out of operating expenses, including such renewals and replacements as have been necessary. * * *

"The property in question here is rendering reasonably adequate service so far as we are informed, and in our opinion it is of nearly as much value to the owner and the public served as a new plant."

The average net earnings of the company for the years 1927, 1928, and 1929, without consideration of any retirement or depreciation expenses, was found to be $45,367.70. A reasonable annual retirement expense was determined to be 2 per cent. of the fair value of the property. Based on rates prepared by the company and presented for approval, the estimated gross earnings for 1930 were found by the commission to be $127,400, and operating expenses to be $83,075.00, including regulatory commission expense of $5,094 and legal expenses of $2,500. These latter expenses the commission found should be spread over a period of years, and that the average annual charge for such expense should not exceed $1,035. An item of federal income taxes in the approximate amount of $2,500 was held to be not a proper expense item. With these several items adjusted, the net earnings for the year 1930, based on the company's proposed rates, were estimated by the commission to be $46,257.45. The opinion states that "the foregoing figures exclude both revenue and expenses from merchandising and wiring operations, miscellaneous deductions, and amortization of debt, discount and expense." That the merchandising business of plaintiff is a substantial source of profit is evidenced by plaintiff's allegation in its complaint that of the amount of dividends paid, totaling $62,680, hereinafter referred to, "the sum of $39,037.42 comprised net earnings from the sale of merchandise."

The commission found that the plaintiff company commenced operations on June 30, 1913, with an initial investment of $75,000. The total investment in the plant to December 31, 1929, was found to be $374,402.65. Of this amount the commission found that $56,188.27 had been retired. Outstanding long term liabilities on December 31, 1929, were $176,000. A common stock dividend of $60,000 was issued in 1925 from surplus, and, subsequently, similar dividends in the amount of $2,680. The opinion of the commission sums up this situation in the following statement: "It thus appears that starting with an initial investment of $75,000, the company now has a plant which cost $318,250.08 and has liabilities outstanding against this plant of $176,000, and in addition has paid common stock dividends of $62,680."

Plaintiff contends that an item of $5,000 paid for water rights was not considered by the engineers in their estimates of present fair value, or by the commission in its findings in respect to such value. The item does not appear to have been considered by the engineers. It should have been considered. It is not clear, however, that the item was not considered by the commission and included in its determination of historical value. Plaintiff does not appear to question the amount found to be the total cost of the plant, $318,250.

It is alleged in plaintiff's complaint that the reduction in rates made by the order of the commission below those proposed by the plaintiff would further reduce plaintiff's operating revenues to the extent of approximately $12,000 per year. Evidence was submitted in support of this allegation. It is the expressed opinion of the commission that this estimated reduction in gross income to some considerable extent would be overcome by increased consumption occasioned by the rate reduction.

The main contentions of plaintiff may be briefly summarized as follows: That the commission virtually discarded evidence of the reproduction cost new, less depreciation, as a means of fixing the fair value of the utility's properties at the time of the hearing; that the commission refused to allow any sum for going concern value; that the commission fixed a depreciation annuity of 2 per cent. to maintain the utility's properties and retire the same at the end of their useful life when both engineers were in agreement that

a sum necessary for such purpose was approximately $24,000 per annum; that a fair consideration of reproduction cost, less depreciation, shows the utility's properties to be of a fair value in excess of $525,000, including intangibles, and as a rate base for the fixing of returns; that upon such rate base the utility's proposed rates would only amount to a net return of 4.63 per cent., and upon the rates established by the commission the percentage of return would be but approximately 2 per cent. per annum; that a net return of 8 per cent. is reasonable.

While the commission only made specific findings respecting historical cost of plant, working capital, and ultimate fair value, it cannot, we think, be said that it did not give due consideration to the element of reproduction cost.

As said in the recent case of Los Angeles Gas & Electric Corp. v. Railroad Commission (D. C.) 58 F.(2d) 256, 258: "Rate cases, when they are brought into court, come impressed with the presumption that the state agency to which has been committed the duty to regulate public utilities has dealt fairly with the business affected, and that in every matter wherein, under any view, a discretion can be said to have been fairly and reasonably exercised, the courts will not interfere with the orders made."

From the opinion we also quote the following: "Basically, the object of an appraisement for rate-making purposes is to find the full value of the investment in the business. The investment is represented by the value of the property used and necessary in the business—not what it would cost to promote and establish a like business starting today." (page 262 of 58 F.(2d).

In the Los Angeles Gas Case, supra, the company "claimed a fair value total of $95,-767,351." The commission in that case found the historical cost to be $60,704,000, and the "present fair value" $65,500,000. While in no sense controlling in this case, it is interesting to note by way of comparison that in the Gas Case less than 10 per cent. was added to the historical cost in determining the present fair value, while in the case at bar more than 25 per cent. was so added.

 As recognized by the commission, reproduction cost is an element to be considered in determining fair value for rate-making purposes, but it is not controlling. It is a matter to be considered in relation to historical cost, and given such consideration as the circumstances of each particular case would appear to justify. It also is an estab-

lished rule that prevailing prices for a particular year in question should not be deemed controlling, but rather average prices prevailing over a period of years immediately preceding, taken in connection with the reasonable outlook for the immediate future. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316.

Commenting on the case last cited, Wilbur, Circuit Judge, in his concurring opinion in the Los Angeles Gas Case, cited supra, said:

"The Supreme Court in this case very clearly indicated that, where there had been so marked an increase in value over so long a period of time, and likely to continue so long after the time when the rates were fixed, it was necessary to recognize this higher cost in fixing the rate base, and that the historical cost should not be accepted where it was based upon a long period of relatively low cost of labor and material.

"In the case at bar we have the situation exactly reversed. The current rates for labor and material have gradually decreased owing to the depression. * * *

"This court will take judicial notice that the costs of reproduction were lessened during the year in which the old rates have been collected by reason of the temporary injunction herein (January 1, 1931, to January 1, 1932)."

Relative to the contention that the commission "refused to allow any sum for going concern value," the following, among other expressions, appears in the findings: "The actual history of the company shows that a going concern was taken over in 1913, and that business had developed gradually, and extensions have been made as business justified the extensions. * * * The plant with which comparison is to be made in ascertaining going concern value is worth only its junk or salvage value less the cost to remove it and make the sale. Furthermore there is no evidence in the record upon which to base going concern value except the mere estimates of the engineers. * * * The valuation herein found contemplates a plant constructed and in successful operation, but no separate amount can be stated for going concern value for the reason stated above."

We think it can hardly be said that there is no evidence in the record upon which to base going concern value except the mere estimates of the engineers. Upon the contrary we think the commission, in expressions contained in its findings quoted from, pointed out certain evidentiary facts and circum-

stances requiring consideration in determining, within some reasonable limitations, what amount should be allowed for going concern value—the history of the plant and development of the business enterprise.

In the exhaustive concurring opinion of Wilbur, J., in the Los Angeles Gas Case, appears also the following:

"It is conceded at the outset with reference to going value that this element must be considered in fixing the rate base. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. * * *

"Whether or not a given expenditure is to be treated as an element of the cost of construction, or of maintenance, or operation, is more or less a matter of judgment. * * * It is also true that expenditures involved in giving life to the dry bones of the enterprise may be treated as overhead charges, or as annual expenditures. That is to say, actual or assumed expenditures, for the purpose of producing the various results entitled to consideration as going concern value, or to be considered overhead, may be carried as promotion expenditures or treated as capital expenditures for attaching business involved in going concern value or as items of overhead, or they may be included in the allowance of annual expenditures charged against the income of the corporation. * * * The importance of these observations which are sufficiently obvious lies in the fact that the commission failed to make a specific finding of going concern value upon the theory that the costs considered and allowed by it in determining the historic cost of the property included the cost of the acquisition of the going concern value, * * * and that in determining the historic cost it had in effect appraised the going concern value." (Page 265 of 58 F.(2d).

"It is relatively easy to estimate a going concern value to be added to the bare bones of the plant in fixing reproduction cost, but comparatively difficult to determine what amount should be added to the historic cost, or to the fair value of a plant long established, where, as here, the cost of attaching business and putting life into the enterprise has already been allowed as items of capital, investment, or current expense, under much the same conditions as the cost of overhead expenditures." (Page 270 of 58 F.(2d).

Referring to the fact that the commission in the Los Angeles Gas Case had expressly declined "to appraise going concern value in estimating either the historic cost or the reproduction cost upon the ground that the current expenditures had taken care of the cost of acquiring the going concern value," Judge Wilbur expressed the opinion that such view "cannot be maintained as to those intangibles not resulting from these expenditures, such as the growth of the city and the successful financial record of the company, that is, its credit." (Page 271 of 58 F.(2d).

If to the historical cost of the plant, $318,000, there is added the sum found by the commission to be sufficient for working capital, $15,000, and a further sum of $7,000 is allowed for material and supplies on hand, there results a total of $340,000. A margin of $60,000 remains to be apportioned between proper allowances for going concern value and reproduction cost, a sum greater by $10,000 than that contended should be allowed by plaintiff for going concern value. In these figures no deduction is made from the historical cost for depreciation.

The court is unable to sustain the contention that due consideration was not given by the commission to going concern value.

The contention that a depreciation annuity of 2 per cent. allowed by the commission to maintain the utility's properties and retire the same at the end of their useful life is grossly insufficient, presents another question requiring serious consideration and one not easy of satisfactory solution.

The engineers for plaintiff and defendant commission are practically in accord that approximately $24,000 of annual revenues should be applied to this purpose. A 2 per cent. annuity on the fair value as found would produce but $8,000, a difference of $16,000. Unless this difference is otherwise met, the allowance for depreciation annuity should be increased. From the commission's findings we quote: "The question of accrued or observed depreciation in this property cannot be considered without considering also the annual allowance for depreciation contended for by the company. Its contention is for an annual allowance of 6 per cent. of the physical value, or $25,516.80 as a depreciation expense. This allowance is presumed to be placed in a reserve, and against this reserve are to be charged all renewals and replacements in order to keep the plant in first class operating condition. In past years this company has charged a varying amount annually and built up a book reserve of about $137,000. This reserve, however, is not represented by cash or securities, and no funds are available for replacements or renewals at this time, for the reason that it has been very largely invested in additions

and betterments and carried into capital account. It further appears that all ordinary renewals and replacements that have been made have been carried in the regular operating accounts under repairs and maintenance. If depreciation allowance is to be permitted as an expense the sums going into the reserve should be policed carefully and only permitted to be used for the purposes specified, that is the renewals or replacements of property retired from service. With our limited force and facilities it would be impossible to exercise the proper supervision over such a reserve, and the final result is simply a theoretical write-off to reduce the apparent net earnings of the company, inasmuch as value when found must be based on actual depreciation and the rule is that the whole amount of the theoretical reserve may not be deducted from the value new in arriving at the rate base. The property in question here is rendering reasonably adequate service so far as we are informed, and in our opinion it is of nearly as much value to the owner and the public served as a new plant. To illustrate the subject under discussion it was testified at the hearing that practically all poles on the Elko Lamoille transmission line had been stubbed with treated stubs, thereby materially increasing the life of this transmission line. This work was not carried on through charges to depreciation reserve against the transmission line. All the stubbing was done under regular maintenance accounts; thus while the public has been required to contribute annually to a sum presumably to be set aside to care for renewals to the Elko Lamoille transmission line, the company increased the life of the line materially by the stubbing of practically all the poles with treated stubs, and no charge has been made against depreciation reserve. This is a sample of the manner in which operations are actually carried on by electric utilities, as opposed to the theoretical write-off for depreciation expenses, and theoretical set-up of depreciation reserve."

A similar question was presented in the Los Angeles Gas Case. In that case the amount allowed by the commission was less than 2 per cent. of the fair value base, and less than one-half the amount claimed for such purpose by the company.

It is quite apparent that the amount which should be allowed for annual depreciation reserve depends very largely upon what is or may be charged against that reserve. Concerning this question the decision of the commission states: "Based upon the experience of other companies, and consid-ering the especially good maintenance practices of the Elko Lamoille Power Company, and the fact that all renewals and replacements to date have been made out of and charged to operating expenses, a 2% allowance, or $8,000 per annum together with the reserve already built up, should be ample to take care of such large retirements as will actually be charged against the reserve in the future. Should the occasion arise when the company can make a showing that the reserve is insufficient this allowance can be adjusted."

Counsel for plaintiff challenges the statement of the commission "that all renewals and replacements to date have been made out of and charged to operating expenses," and assert "that the only item of such nature ever claimed by the city or the Commission is the item of 'stubbing' the poles on the transmission line." As the court's attention is not called to any portion of the record sustaining the assertion of counsel that the statement of the commission is in error, we would not be justified in disregarding it. The court recognizes the importance of a sufficient allowance for annual depreciation reserve, and, if in practice the amount allowed by the commission is found to be insufficient, the commission has recognized its duty to make proper adjustment. This court, at this time, cannot say, in view of the practice of the company to charge certain renewals and replacements to operating expenses, that the commission's allowance for annual depreciation reserve is manifestly insufficient.

In the briefs of counsel for plaintiff we find no challenge of the findings of the commission that, without consideration of any retirement or depreciation expense, the average net earnings of the company for the years 1927, 1928, and 1929, were $45,367.70, and that, based on the rates proposed by the utility after making certain adjustments, heretofore referred to, the estimated net income for the year 1930 would be $46,257.45. It is not reasonable, in view of generally known conditions prevailing during the year 1931, that the utility's proposed rates could have shown an increase in net income over the estimate for the previous year.

The testimony submitted by the utility that the rates fixed by the commission in its order would reduce the gross income $12,500 per year below that which would be produced by the utility's proposed rates does not appear to be controverted by other testimony. The question is dealt with in the commission's opinion as follows: "The testimony of rec-

ord indicates that substantially increased lighting consumption will follow the establishment of such reduced rates as are just and reasonable to the consumers and the company. It is, therefore, impossible to estimate the effect of the proposed schedules. It appears that based upon present conditions there will be a reduction in revenue to the company of between $7,500 and $10,000 per annum."

While under normal conditions some increase in light consumption may reasonably be expected as a result of a reduction in rates, we are not in position, in the absence of some definite estimate, to attempt to make such an estimate.

Assuming no decrease in income occasioned by the general depression, if we deduct from the commission's estimated income based on the utility's proposed rates, $46,257.45, the estimated reduction from gross income occasioned by the rates fixed by the commission, $12,500, we have a remaining estimated net income of $33,750, from which is yet to be deducted a proper allowance for depreciation. Deducting the amount allowed by the commission, $8,000, the result is $25,750 as the amount of net earnings on the rate base of $400,000. Such sum of net earnings would amount to slightly in excess of 6⅓ per cent. per annum.

The utility's contention that the prevailing interest rate in the state and in the section where the properties are located is 8 per cent., does not appear to be questioned otherwise than as stated in the brief for defendants as follows: "We maintain that the plaintiff is not entitled to high and speculative rates, and that interest earned by banks is not a fair criterion, and that cattle raising, mercantile industries and hotels are not to be used as a comparison."

The rate allowed in the Los Angeles Gas Case, where a lower rate as a fair return might reasonably be expected to prevail, was 7 per cent. In 1928 it appears that the California commission adopted 7½ per cent. as a fair return rate.

We do not find that the commission in this case determined any definite rate as a fair rate of return. We are not called upon to determine what would be a maximum fair rate, but we are called upon to determine whether the estimated rate of return would in effect be confiscatory.

In the case of Bluefield Co. v. Pub. Serv. Com., 262 U. S. 679, 692, 43 S. Ct. 675, 679, 67 L. Ed. 1176, the court said: "What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."

In the Bluefield Company Case, the court specifically held: "Under the facts and circumstances indicated by the record, we think that a rate of return of 6 per cent. upon the value of the property is substantially too low to constitute just compensation for the use of the property employed to render the service."

In other cases decided by the Supreme Court a 6 per cent. return was not found to be confiscatory. See cases cited in Dayton-Goose Creek Ry. v. U. S., 263 U. S. 456, 486, 44 S. Ct. 169, 175, 68 L. Ed. 388, 33 A. L. R. 472. In the latter case the court said: "Thus the question of the minimum of a fair percentage on value is shown to vary with the circumstances."

Assuming 8 per cent. to be a fair return on the rate base fixed by the commission, then its order fixing rates which would only earn 6⅓ per cent. has the effect of depriving approximately 20 per cent. or $80,000 of property value of earning power. On a basis of a 7 per cent. fair return approximately 10 per cent. of the fair value of the property would in effect be deprived of earning power.

In the concurring opinion of Wilbur, Circuit Judge, in the Los Angeles Gas Case, appears also the following: "It has long been recognized by the federal court that, if the rate-making bodies would make specific findings of fact with relation to value and return, and particularly if they would make find-

ings clearly showing that they had considered all the elements of value required by the decision of Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, and subsequent rate cases, to be considered, the work of the court would be much simplified, and that, while the federal courts must of necessity, in the use of their constitutional authority, exercise an independent judgment as to value and rate of return, the determination of the rate-making body upon conflicting evidence as to the various elements to be considered in arriving at the value, and in the just determination of the rate to be arrived at by consideration of these elements of value, is entitled to great, though not controlling, weight."

Giving to the decision of the commission a most favorable view respecting all matters upon which specific findings were not made, it satisfactorily appears that the rates fixed by the commission will not return an annual rate which will constitute a just compensation upon the fair value of the property as determined by the commission.

The court is of opinion the writ of injunction should issue as prayed for. It is so ordered.