# PUBLIC SERVICE COMMISSION OF NEVADA, APPELLANT, *v.* ELY LIGHT AND POWER COMPANY, A CORPORATION, RESPONDENT.

### No. 4714

June 18, 1964                                  393 P.2d 305

*Harvey Dickerson,* Attorney General, and *Eli Grubic,* Special Deputy Attorney General, for Appellant.

*Gray and Horton,* and *Belford and Anglim,* of Reno, for Respondent.

## OPINION

By the Court, BADT, C. J.:

This utility rate case comes to us on an appeal from the district court reversing an order of the Public Service Commission.

The commission had upon its own motion instituted an investigation concerning the rates charged by Ely Light and Power Company. NRS 704.120(5).[1]

After a hearing, the commission on July 13, 1961,

---

[1]"The commission may at any time, upon its own motion, investigate any of the rates, tolls, charges, rules, regulations, practices and service, and, after a full hearing as above provided, by order, make such changes as may be just and reasonable, the same as if a formal complaint had been made."

made its findings and ordered the utility to submit revised tariff schedules reflecting annual reductions of $32,767 in domestic lighting revenues, $18,000 in its commercial lighting revenues, and $5,346 in its public street and highway lighting revenues. It should be noted here that the utility owns no generating facilities and no transmission facilities (with the exception of certain poles, transformers, etc.), but since 1922 has purchased all its power requirements from the facilities of Kennecott Copper Corporation. It distributes power to the City of Ely, to White Pine County, and to the towns of Ruth, McGill and East Ely.

At the hearing the usual dispute as to the rate base occurred. On the basis of the utility's annual reports as submitted to the commission and a current audit of the utility's records by the commission, the commission, on a rate base of original cost of plant in service, less depreciation, found that the utility's return ranged for the past several years from 13.71 percent to 15.79 percent. As against this, evidence presented by the utility, upon three different methods of computing its rate base, and contending that reproduction cost, less depreciation, was the proper method to be adopted, showed returns varying from 5.9 percent to 11.6 percent, and that net earnings upon the depreciated reproduction cost, based upon its 1960 operation, would yield 5.9 percent.

On the first appeal to the district court (a complaint seeking a judicial review of the commission's orders, pursuant to NRS 704.540) additional testimony was taken, and the court also considered the evidence introduced before the commission. Pursuant to NRS 704.560 the court then ordered the transmission of a copy of such new evidence to the commission.[2] The commission, after consideration of the new evidence taken before the

[2]The new evidence before the trial court for the most part comprised (a) additional testimony and exhibits reflecting actual 1960 operations rather than those theretofore partially estimated; (b) testimony of the utility's ownership of a portion of poles and transformers used for street lighting; (c) expert testimony on a study of the economy of White Pine County, with characteristics and risks of the respondent's business and earnings; and (d) expert testimony analyzing the utility's business from the standpoint of the security market and capital investment and return.

court, modified the street lighting schedule to reflect the partial ownership by the utility of the facilities connected with such service, but in all other respects sustained its original order. The first hearing before the commission was conducted December 16, 1960, and a second hearing, March 6, 1961. Using original cost, less depreciation, for plant investment, the commission first indicated the rate base for the years ending December 31, 1955, 1956, 1957, 1958, and 1959. For the last-named period it showed the following:

| | |
|---|---:|
| Plant in service | $503,650.81 |
| Reserve for depreciation | 153,608.03 |
| Net plant in service | 350,042.78 |
| Net operating income | 55,261.89 |

Rate of return, 15.79%

It also showed the dividends declared by the utility for these same years, respectively, as follows: 1955, $24,000; 1956, $24,000; 1957, $24,000; 1958, $30,000; 1959, $35,000.

On the other hand, the utility, through its witnesses, fixed its rate base, on the basis of reproduction cost new, less depreciation, at $635,391. This was based in large part on a report prepared by Ebasco Services, Inc., listing all items of property in great detail.

Rate of return reflected by evidence submitted by the utility, under varying methods, was as follows:

| | |
|---|---:|
| *Original Cost Rate Base* | $337,712.48 |
| Working Capital | 63,011.15 |
| | 400,723.63 |
| Net Operating Income | 44,351.14 |

Rate of Return, 11.6%

| | |
|---|---:|
| *Reproduction Cost Rate Base* | |
| Reproduction cost, less depreciation | $635,391.00 |
| Less property not in use | 3,105.00 |
| | 632,286.00 |

Add 10% going concern and development cost_____ 63,228.00

_____ 695,514.00

Working Capital_____ 63,011.15

_____ 758,525.15

Rate of Return, 5.9%

*Fort Dodge Decision Rate Base*[3]
30% Original cost, less depreciation_____ $101,313.74
70% Replacement cost, less
    depreciation_____ 486,860.02

_____ 588,173.76
Working Capital_____ 63,011.15

_____ 651,184.91

Rate of Return, 6.8%

*50–50 Rate Base*
50% Original cost, less depreciation____ $168,856.24
50% Replacement cost, less
    depreciation_____ 347,757.00

_____ 516,613.24
Working Capital_____ 63,011.15

[3a]569,924.39

Rate of Return, 7.8%

The commission rehearing of March 6, 1961, recited that the annual report of the utility for 1960 shows the following results:

[3]Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28.

[3a]Figures given by the utility to the commission and by both parties to the trial court and as contained in the record submitted to this court. The mistake in addition (which should bring this total to $579,624.39) is not a material one.

| | |
|---|---|
| Operating Revenues | $510,115.91 |
| Rents from Plant in Service | 3,804.89 |
| Merchandising & Jobbing | 3,407.11 |
| | |
| Total Operating Revenues | 517,327.91 |
| Total Operating Expenses | 384,378.50 |
| Depreciation Expense | 26,607.58 |
| Taxes | 53,123.52 |
| | |
| Net Operating Income | 53,218.31 |

Rate of Return, 15.5%

The learned district judge in his opinion recited the issues before the court to be as follows:

"(a) Whether the Commission may lawfully exercise its rate making power by the imposition of a ceiling upon a utility's income in lieu of fixing rates for its services.

"(b) Whether the Commission's valuation of a utility's property used and useful in service to the public may be based solely upon a single method of valuation.

"(c) Whether the Commission may lawfully exclude from a utility's rate base a portion of the cost of a pension plan established by a utility for the benefit of its employees, in the absence of any showing that the cost of such pension plan is unreasonable.

"(d) Whether the Commission may delete from a utility's rate base a portion of the sum proposed by the utility as working capital requirements, in the absence of any showing that such sum is unreasonable.

"(e) Whether, in setting the amount of working capital requirements allowable for rate base purposes, the Commission may require 100% of tax accruals to be set off against working capital requirements.

"(f) Whether the refusal of the Commission to include in the rate base computations certain of a utility's physical property used and useful in the public service constitutes a confiscation of such property without just compensation and without due process of law."

The commission's opening brief on appeal from the court's order vacating the commission's order recites its view of the issues presented to be as follows:

"I. Is the Public Service Commission order requiring respondent to submit rate schedules reflecting specific reductions in gross revenues a lawful exercise of the commission's power to fix just and reasonable rates?

"II. May the commission lawfully base its valuation of respondent's property used in public service on its original cost less depreciation?

"III. Is the commission's disallowance as an operating expense of one half of respondent's pension plan cost confiscation of respondent's property?

"IV. Does the commission order of reduction in public street lighting revenues result in confiscation of respondent's property used in furnishing public street lighting?

"V. Does the commission's allowance of working capital for inclusion in the rate base and the commission's deduction from that allowance of tax accruals result in confiscation of respondent's property?"

We think that a discussion, disposition, and determination of the issues as thus last set forth will fully dispose of the more abstract recitals of the issues by the court below.

(1) *Order to reduce revenues.* We first turn to the appellant commission's attack on the court's holding that the commission's order commanding the company to reduce its revenues rather than fixing and establishing just and reasonable rates in place of those charged by the utility was error, requiring reversal.

NRS 704.120 (5) is quoted in full in footnote 1, supra. It should be noted that in addition to the powers there granted under subsection 1 of NRS 704.120 that "* * * the commission shall have the power to fix and order substituted therefor such rate * * * schedules as shall be just and reasonable," subsection 2 of NRS 704.020 gives to the commission "* * * full power of supervision, regulation and control of all such utilities, subject to the provisions of this chapter * * *," and that NRS 704.210 gives the commission power not only to fix but also to regulate rates. An order prescribing revenue

deductions and ordering the submission by the utility of revised schedules to accomplish the same was approved in Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037. A similar provision to our own was contained in the statute under attack in that case (15 U.S.C.A. Sec. 717 d(a) requiring the commission to "to determine the just and reasonable rate * * * [and to] fix the same by order." Accord: Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir. 1955, 226 F.2d 60; Michigan Bell Telephone Co. v. Michigan Public Service Commission, 332 Mich. 7, 50 N.W.2d 826. In like manner the Pennsylvania Supreme Court approved the propriety of the commission's furnishing the basis on which the utility may compute and file the proper rates. Pennsylvania Power and Light Co. v. Public Service Commission, 128 Pa. Super. 195, 193 A. 427, 437.[4]

We, accordingly, hold that the commission's order requiring reductions in gross revenues in the three categories of service was within its authority to make, and the district court erred in deciding otherwise.

(2) *The fixing of the rate base.* The second error assigned by the appellant commission is the court's holding "that the commission's adherence to the single-method approach to the valuation of the company's property was [reversible] error, * * *" was error on the part of the court below. This stems from the commission's adoption of a rate base based on original cost, less depreciation. The court based its holding on language used in Tobacco River Power Co. v. Public Service Commission, 109 Mont. 521, 98 P.2d 886; State v. Public Service Commission, 131 Mont. 272, 309 P.2d 1035, 1038; Southern Pacific Co. v. Bartine, 170 F. 725, 749 (U.S. Circuit Court for Nevada); and Bell Tel. Co. v. Public Service Commission, 70 Nev. 25, 253 P.2d 602, 604. It also relied upon NRS 704.440 reading as follows: "Investigation, ascertainment of value of public utility's property.

---

[4]This holding is not weakened by the fact that the court was impelled to reverse the commission because it had not found sufficient facts to enable the utility to file a proper tariff.

"1. The commission may, in its discretion, investigate and ascertain the value of all property of every public utility actually used and useful for the convenience of the public.

"2. In making such investigation the commission may avail itself of all information contained in the assessment rolls of the various counties and the public records and files of all state departments, offices and commissions, and any other information obtainable."

That the commission was alert to the question presented is evidenced from its opening paragraphs in discussing "type of rate base." The commission stated:

"The question of rate base has been one of the most widely discussed issues in utility regulation. The advocates of various rate base theories have been active in both state and federal regulatory procedures.

"One of the original United States Supreme Court cases on this subject was reported in Smyth v. Ames, 169 U.S. 466 [18 S.Ct. 418, 42 L.Ed. 819]. Here, the Court gave fair value as a standard for determining rate base, and this case was relied upon in the State of Nevada by the Federal District Court in Reno Power, Light and Water Co. v. Public Service Commission, 300 Fed. 645 (1921). This criteri[on] was again followed in Reno Power, Light and Water Co. vs. PSC, 298 Fed. 790 (1923), and again in Elko-Lamoille Power Company vs. PSC, 1 F.Supp. 790 (1932).

"No other Nevada decisions have directly reported on this point since 1932. The United States Supreme Court, in the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333], (1944), approved the Federal Power Commission's decision to reject reproduction cost, or trended original cost, and relied on original cost for rate base purposes.

"The Ely Light and Power Company, in its brief, has advanced several of the fair value theories for rate base purposes. Many of these theories have been adopted by other jurisdictions, but are most notable in jurisdictions which are bound by statute or constitutional provisions to use fair value rate base.

"This Commission, in recent decisions, has used original cost for rate base purposes. The use of original cost as a rate base in rate making matters is not necessarily a method to reduce revenues of utility companies. Rate of return is becoming less important in rate making since the end result of rate making is the more important aspect in which the Commission should be concerned. The real question for regulatory bodies is not the manner in which a rate of return is calculated, or the particular percentage of rate of return that is the mathematical result of which base is used for making the calculation. Rather the question for determination is whether the utility is able to earn enough money to keep it in a healthy financial position,[5] able to meet its fixed costs and pay its investors a reasonable return."[6]

It is to be noted that the language of NRS 704.440 is permissive. The utility was permitted, over objection, to introduce evidence at length portraying the different methods of arriving at "value." The record shows that the point was argued at length and counsel were instructed by the commission to submit briefs in support of and against the arguments used as to the various methods of determining the rate base. The commission did in fact give consideration to all the methods suggested but rejected the propriety, in view of all the conditions appearing, of adopting any one of the suggested methods in preference to or exclusion of original cost, less depreciation. Such method it deemed to be most applicable to the facts and conditions of the

[5]At this point many of the cases insert, "to afford sufficient working capital * * *."

[6]In discussing the submission of the case on briefs, the commissioner stated: "I think very definitely you should cover the legal arguments as to treatment of rate base, and there you will have the discussion of the original cost versus the other methods of reporting rate base, fair value, reproduction, etc." He also asked that the question of working capital, among others, be briefed.

When alternative methods of finding a rate base were offered in evidence, objection was made by the attorney for the commission. The presiding commissioner overruled the objection "on the grounds that it is only evidence, and would be weighed by the commission with the other methods of determining rate base, so it is admitted in evidence."

Ely Light and Power Company. It may be noted in passing that for the commission to adopt reproduction cost, less depreciation, as urged by the utility, would be doing the very thing that the lower court condemned—the use of a "single-method approach." In its reliance on Southern Pacific Co. v. Bartine (Circuit Court, Nevada, 1909), 170 F. 725, and the Montana cases, the court below necessarily was led back to Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). We need not trace the tendency of the United States Supreme Court, through a number of decisions, to wean itself from Smyth v. Ames. This it finally and conclusively did in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. Citing the Hope case in Bell Tel. Co. v. Public Service Commission, 70 Nev. 25, 253 P.2d 602, this court said: "[I]t is not our province to quarrel with methods used by the commission or with methods approved by the district court, no matter how faulty they may have been as means or guides in arriving at sundry determinations involved either in evaluating the property or determining the net return if the end result of the orders made is to permit the company a just and reasonable return."

The trial court, in its reliance on Southern Pacific Co. v. Bartine, supra, adopted reproduction cost, less depreciation, as the method to be used for determining fair value, thus substituting its judgment for that of the commission. The commission, in its consideration of several methods, was not precluded by this court's opinion in Bell Telephone Co. v. Public Service Commission from adopting one of the methods considered, and adopted that of original cost, less depreciation. In thus substituting its judgment for that of the commission, the trial court was in error. See Los Angeles Gas & Electric Corporation v. R.R. Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

(3) *The utility's pension plan.* The appeal next attacks the district court's decision in holding that the commission had acted arbitrarily in disallowing as an

operating expense one half of the cost of the utility's pension plan. The sole reference to this point in the commission's opinion and order is as follows:

"One expense item for 1960 in the exhibit of the Company, and also in the 1960 Annual Report, was a pension plan in the amount of $13,534.96. This expense was instituted by the Company during the latter part of 1960. The plan, as explained by the Company, is an employee retirement program which costs approximately 15% of total wages paid. Company-employee pension plans are becoming a standard today and many employers have retirement plans for employees' benefit. However, in viewing this expense in the light of a rate matter, this Commission feels that for the Company to pay such a high cost for the plan is not in the best interest of the rate payers. If the Company wishes to continue this particular plan, we cannot alter such intention, but we can, for rate making purposes, allow a percentage of the cost as an expense to the rate payer and the balance would become an expense to the stockholders."

We quote the trial court in its disagreement with the commission on this item:

"After a careful and painstaking review of the record, this Court is constrained to hold that the Commission's finding that the cost of this pension plan is unreasonable is not supported by the evidence. In the final analysis, the cost of such pension plans are a part of the cost of salaries and wages paid to the Company's employees, and unless unreasonable, are properly included in the rate base. State v. Tri-State Tel. & Tel. Co., 204 Minn. 516, 284 N.W. 294, 316; Central Maine Power Co. v. Public Utilities Comm., 150 Me. 257, 109 A.2d 512, 520. There being no competent evidence before the Commission to support its finding that the cost of the pension plan was unreasonable, to delete 50% of such cost from the rate base computations was arbitrary, confiscatory and erroneous, requiring reversal."

We agree with the trial court. A search of the record finds nothing to support the commission's conclusion on

324

this item. The commission, on this point, relies upon the provision of NRS 704.550, throwing the burden of proof upon any party attacking the order of the commission, to show by clear and satisfactory evidence that the order is unlawful or unreasonable. The commission refers constantly, in addition, to the presumption of the legality of its orders. However, one finds in the cases the recurring statement of such presumption "if the order finds substantial support in the evidence." We find also many references, in turn, to the presumption of the proper exercise of judgment by the utility in matters which are particularly a function of management. It is the commission's duty to regulate rates but not to manage the utility's business. Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Com'n, D.C., 11 F.2d 319, 325. In the absence of an abuse of discretion on the part of the utility and in the absence of showing lack of good faith, inefficiency or improvidence, and if the amounts in question are reasonable and are actually paid as pensions or are allocated to a proper fund under a feasible plan, the commission should not substitute its judgment for that of management. State v. Tri-State Tel. & Tel. Co., 204 Minn. 516, 284 N.W. 294, 316; Central Maine Power Co. v. Public Utilities Commission, 150 Me. 257, 109 A.2d 512, 520; West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761, 769; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 985. In Central Maine Power Co. v. Public Utilities Com'n, 150 Me. 257, 109 A.2d 512, 520, the court said concerning the pension plan: "The determination was primarily a matter of managerial discretion and certainly no abuse of such discretion was involved, nor was there any capricious or arbitrary action which would place an unfair burden upon any group of consumers. * * * It was error for the Commission to disregard the annual charge for pension payments which was included in Amortization and General Expense." Accord: State Public Utilities Commission ex rel. City of Springfield v. Springfield Gas & Electric Co., 291 Ill. 209, 234, 125 N.E. 891. See Monroe Gaslight

& Fuel Co. v. Michigan Public Utilities Com'n, D.C., 11 F.2d 319, 325.

(4) *The street lighting rate.* The court held that the commission's order reducing the rates for public street lighting results in confiscation, and the utility asserts that this is amply and conclusively shown by the fact that the street lighting rate is less than the rate that the utility must pay for power.

The contract between Kennecott Copper Corporation and Ely Light & Power Co., as amended, provides for sale of power according to the following schedule:

> First 150,000 KWH @   0.02
> Next 250,000 KWH @   .019
> Next 400,000 KWH @   .018
> All over 800,000 KWH @  .0175

The rate for street lighting ordered into effect by the commission was 2.4000¢ per KWH.

The utility claims that its *average* cost of delivering the service is 3.405¢ per KWH and that the excess of cost over receipts, for the year 1960, for street lighting, is $7,085.63. This it derives from the following figures:

| | |
|---|---|
| [Total] operating expense for 1960 | $429,412.29 |
| Total KWH sold 1960 | 12,609,933. |
| Cost per KWH 1960 | 3.405¢ |
| Total KWH sold to Ruth, Ely, East Ely, McGill, and White Pine County | 705,038. |
| Cost of KWH sold to five municipalities (705.038 x 3.405¢) | $24,006.54 |
| Rate chargeable by Ely L.&P. Co. per order July 12, 1961 | 16,920.91 |
| Excess of cost over receipt for sales | $7,085.63 |

But this is a non sequitur. We have been unable to find in the record any justification for apportioning the entire operating expense for delivering the entire KWH

sold, to the KWH sold to the five municipalities. In other words, we do not know that the cost of the street lighting was the same as the cost of the industrial and residence lighting.

Respondent's contention that "the income received from the sale of power [for street lighting] is less than the cost * * *" is not borne out by the record and is without merit.[7]

(5) *Working capital.* The commission found a requirement for working capital in the sum of $155,805 and took one eighth of this (as representing a period of approximately six weeks, with which the utility does not seem to have any complaint), namely, $19,475. To this it added material and supplies in the sum of $13,232, making a total of $32,707. Up to this point there is no serious disagreement. However the commission, referring not to court decisions but to its former decisions in rate cases, held that where a utility has available to it certain accrued accounts from operating expenses such as reserve for federal income taxes and reserve for property taxes, this must be utilized to the extent that these were sufficient to provide the necessary funds for working cash and materials and supplies, and that allowance must be made only for the balance after deducting such tax accruals. The commission found that estimated property taxes amounted to $14,000 and estimated federal income taxes amounted to $16,100, a total of $30,100, and deducted such sum from the $32,707 found to be necessary for working capital, thus reducing its allowance for working capital to $2,607. The difficulty with this is that no showing was made of the availability of the tax accruals at the times when working capital was necessary. The presiding commissioner questioned one of the witnesses in this regard and asked

---

[7]The court found that the commission failed to take into account in determining the rate base the fact that the power company owned a number of power poles and transformers used by the municipality of Ely. The commission at its hearings used plant figures taken directly from the power company books. There was no showing at trial that these figures considered by the commission did not include the value of the poles and transformers.

with reference to taxes: "Q. But they are accrued monthly? A. Their income tax is not. Q. But the money available for income tax is available at the end of each month during the current year; is that not correct? A. Well, that may not be necessarily true. * * * They do not accrue it monthly so that at the end of the year you have accrued actually or fairly close. It is computed at the end of the year and accrued December 31st and paid half on March 15th and half on June 15th. It isn't necessarily true that the money would be available. It might be the situation, as was the case when they bought the other two properties, there for a time they were very low on cash. I don't recall from memory right off hand whether there was enough, but they may have had to borrow money to pay the income tax." In Chesapeake & Potomac Tel. Co. v. Public Service Commission, 201 Md. 170, 93 A.2d 249, 256, the court applied the tax accumulations against required working capital "since these advance payments *are available for current use* until they become payable to the taxing authorities * * *." (Emphasis supplied.)

And in the trial de novo before the court below the utility's expert witness Nelson testified on cross-examination: "[The accrued amounts] would be available until the time the tax is paid, which is twice a year, and at such time they would have to use funds which would be used to pay expenses. The day after the taxes were paid their working capital would be depleted practically and they would have to start building it again to take care of their normal operating expenses from day to day."

Another witness testified, with reference to required working capital: "This is based on 1960 figures, which amounts to six weeks of the total operating expenses * * * $431,000, which amounts to $49,779.40. Now, this is due to the necessity of having to pay expenses prior to the collection of operating income, the lag in the billing and collection, and this is a normal period for computing this. It is sometimes one-eighth of a year that is used, sometime six weeks. * * * To that, ordinarily in computing working capital requirements for a public utility,

they add the material and supplies inventory, which was $13,231.75, making total working capital requirement of $63,011.15."[8]

The commissioner, in cross-examining the utility's witness, after calling attention to the fact that the utility collects its income each month and that the federal income tax is payable one half on March 15 and one half on June 16, asked: "So that there *could* be *some* funds available from the accrued accounts to meet the obligations of the working capital; is that correct? A. That is right. This is the working capital requirement computed this way. On this computation, theoretically that is the working capital at all times, every day, each day." And in the trial de novo before the court below, the utility's expert witness, Nelson, testified on cross-examination:

"[The accrued accounts] would be available until the time the tax is paid, which is twice a year, and at such time they would have to use funds which would be used to pay expenses. The day after the taxes were paid their working capital would be depleted practically and they would have to start building it again to take care of their normal operating expenses from day to day." In the City of Cincinnati v. Public Utilities Commission, 161 Ohio St. 395, 119 N.E.2d 619, the court indeed referred to the general rule that where the rate payers provide such funds, it is not proper that the stockholders should be allowed a return on them by including them in the rate base. However, it referred to the accruals "which will be constant with reasonable certainty in the foreseeable future and which are available for working capital and for investment in materials and supplies * * *." This limitation it emphasized by repeating it later in the opinion.

In fact the only testimony in the record consists of these statements, indicating that the tax accruals would not be available when needed; or if, for example,

---

[8]This included depreciation and the monthly payments to Kennecott for power. These were deducted by the commission, resulting in the figure for working capital as $32,707. The commission's action in this respect is not attacked in this appeal.

accruals were on hand sufficient to make the June 15th tax payment and were used for that purpose and this would virtually exhaust all of the accruals on hand, then there is no showing of how the utility could meet its payrolls and other expenses without providing further working capital. In short, the disallowance of the presumed $30,100 of tax accruals is based on nothing but the commission's assumption that these accruals would be available for operating revenues.

On this point the commissioner refers to several authorities supporting the view of deducting from working capital the sums available from tax accruals. In these cases, however, the evidence supported the availability of the tax accruals for use as working capital. See, for example, Petition of Mountain States Tel. & Tel. Co., 76 Idaho 474, 284 P.2d 681. Such evidence is lacking in the instant case.

The commission says that its effectiveness would be unduly restricted unless it could utilize "its knowledge acquired over an extended period of rate regulation." In our opinion this is not a substitute for evidence. This would allow no way for a utility to combat a commission's "finding." We cannot but affirm the trial court's holding that such action was arbitrary.

The district court's order, discussed under topic 3, holding invalid the commission's deletion from the rate base computations of 50 percent of the expense of the utility's pension plans, is affirmed.

The district court's order, discussed under topic 5, to the effect that the commission's order that the utility's working capital must be reduced from $32,707 to $2,607 by reason of the availability of tax accruals, as being without support in the evidence, is affirmed.

The order of the district court, discussed under topic 1, holding the commission's order invalid because, in place of establishing new rates, it ordered the utility to reduce its operating revenues in its three categories of service, is reversed.

The order of the court below, discussed under topic 2, holding that the commission was in error in adopting a

rate base of original cost, less depreciation, after considering all other methods suggested for establishing the rate base, is reversed.

The lower court's order, discussed under topic 4, holding that the reduction in operating revenues from street lighting amounted to a confiscation of the utility's property, is reversed.

The case is accordingly remanded to the court below with directions for its remand to the Public Service Commission of the State of Nevada for further consideration as follows: (1) either to correct its deletion of one half of the expense of the utility's pension plan, or to take further evidence showing that the cost of said plan was capricious or arbitrary, or an abuse of discretion, or would place an unfair burden upon any group of consumers, and beyond the function of the utility in exercising its powers of management; (2) either to correct its deletion of tax accruals from working capital (thus reducing the working capital to $2,607) or to take additional evidence to show that the tax accruals will be available, and if so, to what extent, for use as working capital.

The taking of such evidence shall be at the convenience of the commission and the utility and upon due notice, with the right of both parties to offer evidence upon the said two subjects.

Each party will pay its own costs in this court.

MCNAMEE and THOMPSON, JJ., concur.